# No. 23-600

## United States Court of Appeals
## For the Second Circuit

SUSAN GIORDANO, ANGELENE HAYES, YING-LIANG WANG, and ANJA BEACHUM, on behalf of themselves and others similarly situated,

*Plaintiffs-Appellants,*

- v. -

SAKS INCOPORATED, SAKS & COMPANY LLC, SAKS FIFTH AVENUE LLC, LOUIS VUITTON USA LLC, LORO PIANA & C. INC., GUCCI AMERICA, INC., PRADA USA CORP., and BRUNELLO CUCCINELLI USA, INC.,

*Defendants-Appellees.*

On Appeal from an Order of The United States District Court
For The Eastern District of New York in Case No. 20-CV-833,
Hon. Margo K. Brodie, District Judge

### BRIEF FOR PLAINTIFFS-APPELLANTS

INNESSA M. HUOT
ALEX J. HARTZBAND
**FARUQI & FARUQI, LLP**
685 THIRD AVENUE, 26TH FLOOR
NEW YORK, NEW YORK 10017
(212) 983-9330

JOSEPH R. SAVERI
STEVEN N. WILLIAMS
KEVIN E. RAYHILL
**JOSEPH SAVERI LAW FIRM, INC.**
601 CALIFORNIA STREET, SUITE 1000
SAN FRANCISCO, CA 94108
(415) 500-6800

ERIC L. CRAMER
PATRICK F. MADDEN
MICHAELA L. WALLIN
**BERGER MONTAGUE PC**
1818 MARKET STREET, SUITE 3600
PHILADELPHIA, PA 19103
(215) 875-3000

JOSHUA P. DAVIS
**BERGER MONTAGUE PC**
505 MONTGOMERY STREET, STE. 625
SAN FRANCISCO, CA 94111
(415) 689-9292

*Counsel for Plaintiffs-Appellants*
*(additional counsel on signature page)*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF JURISDICTION.................................................... 1

STATEMENT OF ISSUES PRESENTED.......................................... 1

STANDARD OF REVIEW ............................................................... 2

STATEMENT OF THE CASE .......................................................... 2

I.     Nature of the Case and Procedural History ............................ 2

II.    The Parties............................................................................. 3

III.   Factual Background ............................................................... 4

IV.    Legal Background.................................................................. 9

       A.    Antitrust Claims Under Section 1 of the Sherman Act ........... 9

             1.    Legal Standard: *Per Se* or Rule of Reason.................... 10

                   a.    *Per Se* Illegality ................................................. 10

                   b.    Rule of Reason.................................................. 12

       B.    Statute of Limitations for Antitrust Claims ........................... 14

SUMMARY OF THE ARGUMENT ................................................. 16

ARGUMENT ................................................................................... 22

I.     Appellants All Brought Timely Claims Under the Continuing Violation
       Doctrine................................................................................ 22

       A.    *US Airways* Applies Only to Anticompetitive Terms in Formal
             Contracts ........................................................................ 24

       B.    US Airways Should Apply Only Under Limited Circumstances .......... 28

II.    The District Court Erred in Holding that the Rule of Reason Should
       Apply……………………………………………………………..… 31

       A.    The District Court Adopted the Wrong Legal Standard........................ 34

i

B.  The District Court Improperly Drew Factual
    Inferences for Appellees ......................................................37

    1.  Appellants plausibly pleaded that Appellees entered a naked
        market allocation that is properly subject to *per se* review. ..........41

    2.  Appellees' argument in moving to dismiss and the District Court's
        reasoning confirm the plausibility of Appellants' allegations. ......43

    3.  To credit Appellee's contention that the no-hire Scheme was
        ancillary to Appellees' business relationship, the District Court
        improperly relied on facts outside the pleadings. ..........................45

C.  Appellants Adequately Stated a Claim Under the Per Se Rule and the
    District Court Should Have Denied Appellees' Motion to Dismiss......47

III.  Appellants State a Claim under the Rule of Reason ......................................48

    A.  Appellants Make Non-Conclusionary Allegations Of Market-Wide
        Anticompetitive Effects ........................................................49

    B.  The District Court's Conclusion that Appellants Did Not Sufficiently
        Plead Market-Wide Anticompetitive Effects Is Internally Inconsistent
        ..............................................................................................52

    C.  The District Court Conflated the Issues of Whether Appellees' Scheme
        Might Have Procompetitive Effects with Whether It Had Market-Wide
        Anticompetitive Effects ........................................................55

CONCLUSION .................................................................................57

# TABLE OF AUTHORITIES

Cases                                                                                                    Page(s)

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012) ............................................................... 2, 9, 40, 43

*Arizona v. Maricopa Cnty. Med. Soc.*,
   457 U.S. 332 (1982) ............................................................................... 10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................... 38

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
   9 F.4th 1102 (9th Cir. 2021) ............................................................... 34

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
   2018 WL 3032552 (S.D. Cal. June 19, 2018) ............................ 38, 39

*Bacon v. Phelps*,
   961 F.3d 533 (2d Cir. 2020) ............................................................... 38

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................... 38

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
   603 F.2d 263 (2d Cir. 1979) ..................................................... 15, 22, 24

*Borozny v. Raytheon Techs. Corp.*,
   2023 WL 348323 (D. Conn. Jan. 20, 2023) ................................. passim

*Cal. Dental Ass'n v. F.T.C.*,
   526 U.S. 756 (1999) ............................................................................... 10

*Capital Imaging Assocs. P.C. v. Mohawk Valley Med. Assocs., Inc.*,
   996 F.2d 537 (2d Cir. 1993) ............................................................... 13

*Cavello Bay Reinsurance Ltd. v. Shubin Stein*,
   986 F.3d 161 (2d Cir. 2021) ............................................................... 38

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) ............................................................... 38

*DXS, Inc. v. Siemens Med. Sys., Inc.*,
   100 F.3d 462 (6th Cir. 1996) ................................................................. 25, 26, 29

*Eichman v. Fotomat Corp.*,
   880 F.2d 149 (9th Cir. 1989) ................................................................ 26, 28, 30

*F.T.C. v. Indiana Fed'n. of Dentists*,
   476 U.S. 447 (1986) .......................................................................................... 10

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
   386 F.3d 485 (2d Cir. 2004) ............................................................................. 13

*Grand Rapids Plastics, Inc. v. Lakian*,
   188 F.3d 401 (6th Cir. 1999) ........................................................................... 26

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
   392 U.S. 481 (1968) .................................................................. 14, 23, 24, 29

*In re Animation Workers Antitrust Litig.*,
   123 F. Supp. 3d 1175 (N.D. Cal. 2015) ................................................... passim

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
   261 F. Supp. 2d 188 (E.D. N.Y. 2003) ............................................................ 14

*In re Delta Dental Antitrust Litig.*,
   484 F. Supp. 3d 627 (N.D. Ill. 2020) ........................................................ 38, 39

*In re Geisinger Health & Evangelical Cmty. Hosp. Healthcare
   Workers Antitrust Litig.*,
   2021 WL 5330783 (M.D. Pa. Nov. 16, 2021) .................................................. 52

*In re High-Tech Emp. Antitrust Litig.*,
   985 F. Supp. 2d 1167 (N.D. Cal. 2013) .................................................... 51, 52

*In re High-Tech Employee Antitrust Litig.*,
   856 F. Supp. 2d 1103 (N.D. Cal. 2012) ................................................... passim

*In re Outpatient Med. Ctr. Emp. Antitrust Litig.*,
   630 F. Supp. 3d 968 (N.D. Ill. 2022) .................................................. 38, 39, 55

*In re Pre-Filled Propane Tank Antitrust Litig.*,
   860 F.3d 1059 (8th Cir. 2017) .............................................................. 15, 22, 24

*In re Ry. Indus. Emp. No-Poach Antitrust Litig.*,
   395 F. Supp. 3d 464 (W.D. Pa. 2019)................................................ 11, 20, 32, 55

*In re Se. Milk Antitrust Litig.*,
   2010 WL 8228839 (E.D. Tenn. Dec. 8, 2010) .....................................................53

*In re Wholesale Grocery Prod. Antitrust Litig.*,
   752 F.3d 728 (8th Cir. 2014) ............................................................... 15, 22, 24

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997)............................................................................... passim

*Knopf v. Esposito*,
   803 F. App'x 448 (2d Cir. 2020) .....................................................................43

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008) ................................................................... passim

*Matson v. Bd. of Educ. of City Sch. Dist. of New York*,
   631 F. 3d 57 (2d Cir. 2011) ............................................................................38

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*,
   198 F.3d 823 (11th Cir. 1999) ................................................................. 15, 24

*N.Y. ex rel. Spitzer v. Saint Francis Hosp.*,
   94 F. Supp. 2d 399 (S.D.N.Y. 2000) ........................................................ 11, 31

*Nat'l Bancard Corp. v. VISA USA Inc.*,
   779 F.2d 592 (11th Cir. 1986) ........................................................................34

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of,
   Okla.*, 468 U.S. 85 (1984)....................................................................... passim

*Nat'l Soc. of Pro. Eng'rs v. United States*,
   435 U.S. 679 (1978)........................................................................................10

*Nitsch v. Dreamworks Animation SKG Inc.*,
   315 F.R.D. 270 (N.D. Cal. 2016)......................................................................52

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018).............................................................................. 12, 48

*Oliver v. SD-3C LLC*,
   751 F.3d 1081 (9th Cir. 2014) ........................................................ 15, 24

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
   792 F.2d 210 (D.C. Cir. 1986) ................................................................34

*Sacerdote v. New York Univ.*,
   9 F.4th 95 (2d Cir. 2021) ........................................................................37

*Seaman v. Duke Univ.*,
   2018 WL 671239 (M.D.N.C. Feb. 1, 2018) .................................... 51, 52

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) ........................................... 13, 41, 43, 47

*Tops Mkts. Inc. v. Quality Mkts. Inc.*,
   142 F.3d 90 (2d Cir. 1998) ....................................................................13

*Turner v. McDonald's USA, LLC*,
   2020 WL 3044086 (N.D. Ill. Apr. 24, 2020) .................................. 15, 16, 22, 24

*U.S. v. Am. Express Co.*,
   838 F.3d 179 (2d Cir. 2016) ..................................................................53

*U.S. v. Patel*,
   2022 WL 17404509 (D. Conn. Dec. 2, 2022) ......................................42

*United States v. Aiyer*,
   33 F.4th 97 (2d Cir. 2022) .............................................................. 33, 40

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015) ........................................... 9, 10, 12, 36

*United States v. Bertelsmann SE & Co. KGaA*,
   2022 WL 16949715 (D.D.C. Nov. 15, 2022) .......................................53

*United States v. DaVita Inc.*,
   2022 WL 266759 (D. Colo. Jan. 28, 2022) ..........................................42

*United States v. Topco Assocs., Inc.*,
   405 U.S. 596 (1972) ......................................................... 11, 31, 41

*United States v. eBay, Inc.*,
  968 F. Supp. 2d 1030 (N.D. Cal. 2013) ........................................................ passim

*US Airways, Inc. v. Sabre Holdings Corp.*,
  938 F.3d 43 (2d Cir. 2019) ......................................................... passim

*Varner v. Peterson Farms*,
  371 F.3d 1011 (8th Cir. 2004) .............................................. 26, 28, 29

*Vaughn v. Phoenix House N.Y. Inc.*,
  957 F.3d 141 (2d Cir. 2020) ............................................................... 38

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010) .................................................. 15, 16, 22, 24

*Weyerhaeuser Co v. Ross-Simmons Hardwood Lumber Co.*,
  549 U.S. 312 (2007) ............................................................................ 48

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  401 U.S. 321 (1971) .......................................................... 13, 22, 23, 29

## Other Authorities

Phillip E. Areeda (late) & Herbert Hovenkamp,
*Antitrust Law: An Analysis of Antitrust Principles and Their Application*
(4th & 5th Eds. 2013-2023) ............................................................. *passim*

Phillip E. Areeda (late) & Herbert Hovenkamp,
*Antitrust Law: An Analysis of Antitrust Principles and Their Application*
(3d Ed. 2012) ...................................................................................... 42

## STATEMENT OF JURISDICTION

This appeal arises from the District Court's orders of February 1, 2023, and March 20, 2023, the latter dismissing the case with prejudice. The District Court had jurisdiction under 15 U.S.C. §§ 15(a), 26 and 28 U.S.C. §§ 1331, 1337(a). Plaintiffs-Appellants Susan Giordano, Angelene Hayes, Ying-Liang Wang, and Anja Beachum ("Appellants") filed a timely notice of appeal on April 14, 2023. A-258. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED

1.  Whether the District Court incorrectly applied *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019) ("*US Airways*") in holding that the statute of limitations bars the claims of three of the Appellants even though they did not allege Defendants-Appellees ("Appellees") violated Section 1 of the Sherman Act, 15 U.S.C. § 1, through formal contracts that injured Appellants.

2.  Whether the District Court erred in holding that the *per se* rule does not apply to Appellants' claim under Section 1 of the Sherman Act, by adopting the wrong legal standard and improperly drawing inferences in favor of Appellees rather than Appellants.

3.  Whether the District Court erred in holding that Appellants did not adequately allege market-wide anticompetitive effects by: (1) overlooking Appellants' non-conclusory allegations plausibly establishing market-wide effects;

1

(2) drawing an inference against Appellants that was inconsistent with how the District Court defined the relevant antitrust market; and (3) conflating whether the no-hire scheme had market-wide anticompetitive effects with whether it had potential procompetitive effects.

## STANDARD OF REVIEW

This Court's review of a district court's grant of a Rule 12(b)(6) motion is *de novo*. *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

## STATEMENT OF THE CASE

**I.    Nature of the Case and Procedural History**

Appellants were luxury retail employees ("LREs"), hired by certain Appellees to sell high-end luxury goods. Appellants brought a proposed antitrust class action alleging that the Brand Appellees[1] conspired with Appellees Saks Incorporated, Saks & Company LLC, and Saks Fifth Avenue LLC (collectively, "Saks") not to hire Saks's LREs (the "Conspiracy" or "Scheme").

The Brand Appellees and Saks are horizontal competitors in hiring employees. Appellants alleged that the Conspiracy restrained competition for labor, suppressed job mobility, and artificially decreased compensation for

---

[1] The Brand Appellees are Louis Vuitton USA Inc. ("Louis Vuitton"), Loro Piana & C. Inc. ("Loro Piana"), Gucci America, Inc. ("Gucci"), Prada USA Corp. ("Prada"), and Brunello Cucinelli USA, Inc. ("Brunello Cucinelli").

2

Appellants and the proposed class of LREs. The alleged Conspiracy violates Section 1 of the Sherman Act. Appellants sought damages and injunctive relief on behalf of themselves and the proposed class.

Appellants filed this action on February 14, 2020 and filed a Consolidated Amended Complaint ("CAC") on May 1, 2020. A-1; A-38. The Appellees moved to dismiss the CAC under Federal Rule of Civil Procedure 12(b)(6) on December 30, 2020. A-85. On February 1, 2023, the Honorable Margo K. Brodie in the Eastern District of New York issued a Memorandum and Order granting Appellees' motion to dismiss while granting only Appellant Anja Beachum leave to file a second amended complaint. A-208.

The District Court subsequently issued a text-only order on March 20, 2023, dismissing the case and directing the Clerk of Court to enter judgment. Judgment in favor of the Appellees was entered on March 21, 2023. A-257. The memorandum opinion and judgment are the subject of this appeal.

## II.    The Parties

Appellants brought this action on behalf of LREs throughout the United States who were employed by at least one of the Appellees at any time after September 30, 2015. A-69 at ¶ 197. LREs are skilled salespeople, trained to sell high-end luxury goods for Appellees. A-38 at ¶ 1; A-44-45 at ¶¶ 31-38. Appellants

3

formerly worked in Saks stores in New York, Michigan, and Ohio,[2] and were injured by being paid artificially low compensation because of the Conspiracy. A-40 at ¶¶ 8-11; A-17 at ¶ 106; A-62 at ¶ 140; A-63 at ¶ 155; A-67 at ¶ 187; A-68-69 at ¶¶ 192-96. Appellees are the "dominant employers of [LREs] in the United States," A-46-47 at ¶¶ 40-51, who—but for the Conspiracy—would compete for LREs in a competitive LRE labor market. A-44 at ¶¶ 29-30; A-46 at ¶¶ 39-40; A-48-49 at ¶¶ 53, 55-57.

## III.    Factual Background

Appellants alleged that Appellees conspired to suppress LRE job mobility and total compensation through agreements not to hire Saks's LREs. A-38-38 at ¶¶ 1-2; A-41-42 at ¶ 20; A-52 at ¶ 81; A-54-55 at ¶¶ 88-89, 91-94; A56-57 at ¶¶ 99-105; A-72 at ¶ 210. Pursuant to this Conspiracy, starting in early 2014 and continuing to this day, the Brand Appellees agreed with Saks not to hire Saks's LREs. *See*, *e.g.*, A-38-39 at ¶¶ 1-2; A-41-42 at ¶ 20; A-48 at ¶ 52; A-54-56, ¶¶ 89-94; A-56-57 at ¶¶ 100-02; A-59 at ¶ 118. Specifically, the Brand Appellees agreed not to hire Saks's LREs without either the permission of Saks's management or until at least six months after the LRE separates from Saks. A-54-55 at ¶¶ 89-94;

---

[2] Appellants worked for Saks as LREs from approximately: November 2012 through March 2019 in the case of Ms Giordano; August 2013 through July 27, 2016 in the case of Ms. Hayes; October 2014 to April 2016 in the case of Ms. Wang; and between February 2016 and September 2016 as well as between Summer of 2018 and December 2019 in the case of Ms. Beachum.

4

A-59 at ¶ 119; A-72 at ¶ 210; *see also* A-81-84, Ex. B. Saks is the ringleader of the Conspiracy, and each illegal agreement between Saks and the Brand Appellees included common restrictions with the purpose and effect of restricting LRE mobility and depressing LRE compensation. A-54 at ¶¶ 90, 92; A-59 at ¶ 119.

Appellants alleged direct evidence of the Conspiracy, including admissions about the no-hire agreements. For instance, Saks's Human Resources Director admitted to the existence of the agreements. A-59 at ¶¶ 116-20. Further, in response to Appellants' employment inquiries, Prada, Gucci, Louis Vuitton, and Loro Piana's store managers stated they could not hire Saks's LREs until after they had left Saks for six months, precisely reflecting the terms of the alleged no-hire agreements. A-58-60 at ¶¶ 114-26; A-62-64 at ¶¶ 140-50, 155-61; *see also* A-78-79, Ex. A. Additionally, Louis Vuitton's in-house counsel confirmed its no-hire agreement with Saks in a position statement submitted to the U.S. Equal Employment Opportunity Commission ("EEOC") when responding to a charge of discrimination filed by Appellant Hayes; Louis Vuitton defended its refusal to consider Ms. Hayes for employment by asserting that it was honoring its no-hire agreement with Saks. A-60-61 at ¶¶ 130-33; A-81-84, Ex. B.

Others in the industry likewise corroborated Appellees' no-hire Scheme. A-65-67 at ¶¶ 173-81, 188. As an example, beginning in 2017, Appellant Giordano spoke with two prominent recruitment agencies with experience placing candidates

in the luxury retail industry, including with Loro Piana, Brunello Cucinelli, and Louis Vuitton. A-65-66 at ¶¶ 173-81. Representatives from both agencies confirmed that "despite Ms. Giordano's experience, they would be unable to place her with any brand carried by Saks" and that Ms. Giordano "would have to leave Saks 'for a couple of months' before the agency could place her" with one of the Brand Appellees. A-65-66 at ¶¶ 175-76.

Appellants alleged that Appellees operate and employ LREs nationwide, and that the Conspiracy is directed at and affects their LREs nationwide. *See* A-46-47 at ¶¶ 39-51. The terms of the no-hire Conspiracy are substantially identical for each Brand Appellee regardless of location. The Conspiracy consists of at least five substantively consistent no-hire agreements, involving the same ringleader, Saks, across all Brand Appellees and geographic locations. A-56 at ¶¶ 99-100; A-57 at ¶ 106; A-59 at ¶ 118; A-62 at ¶ 140; A-63 at ¶ 155; A-67 at ¶ 187. The no-hire Conspiracy allows the same narrow exceptions where a Brand Appellee may hire a current or former Saks LRE "only if: (i) managers from both co-conspirators (*i.e.,* Saks and the given Brand Appellee) agree to allow the [LRE] to transfer; or (ii) if more than six (6) months have passed since the [LRE] was last employed by Saks." A-54 at ¶ 92. Appellants encountered these same terms of the no-hire Conspiracy as between different Brand Appellees and Saks in Ohio, Michigan, and New York. A-57 at ¶ 106; A-62 at ¶ 140; A-63 at ¶ 155; A-67 at ¶ 187.

Appellants alleged that the no-hire Conspiracy is not necessary to the Appellees' business operations or to any collaboration between them. Companies instead can maintain a consistent work force of skilled LREs by making it attractive enough for employees not to leave. A-54 at ¶ 88. The goal and effect of the Conspiracy is not procompetitive, but rather is to suppress competition and to reduce mobility and compensation for all LREs. A-39 at ¶ 2; A-54-55 at ¶ 93.

Appellants also alleged that the effects of the Conspiracy are market-wide. A-50-53 at ¶¶ 65-85. That follows from the impact of competition on compensation in labor markets. Such competition creates the need for (1) "[p]reemptive retention measures" (A-50 at ¶¶ 66-70), and (2) reactive compensation increases (A-50-51 at ¶¶ 71-74), both of which put upward pressure on wages for all employees in a labor market. In other words, in response to competition, employers increase their compensation across-the-board (1) to maintain morale and discourage their employees from exploring outside options and (2) to retain employees once they have developed an interest in leaving. A-50-51 at ¶¶ 66-74.

One mechanism by which Appellees' no-hire Conspiracy causes anticompetitive effects "throughout the luxury retail industry" is by preventing the communication of information that would occur if Saks and the Brand Appellees competed for each other's LREs. A-52-54 at ¶¶ 81-88. Competition for employees

7

reveals to workers prevailing rates of compensation that put upward pressure on wages market-wide. *Id.*

Further, employers, including all Appellees, monitor and manage their internal compensation structures and levels, so that the Conspiracy's suppression of competition for LRE labor transmits broadly to LREs across the market. A-51-52 at ¶¶ 75-80. Employers maintain equity in compensation within and across categories of workers, causing increases in pay to a subset of employees to have company-wide and market-wide consequences. *Id.*

The Conspiracy commenced no later than 2014 (A-54 at ¶ 91; A-72 at ¶ 210), and Appellees performed numerous overt acts in furtherance of it that continue to the present. A-40 at ¶¶ 8-11; A-56-57 at ¶¶ 99-104; A-61 at ¶ 138; A-62-63 at ¶¶ 147-52; A-65-66 at ¶¶ 171-81; A-67 at ¶ 186; A-68 at ¶¶ 190-91. For example, Saks repeatedly paid each Appellant artificially suppressed compensation because of the unlawful Scheme throughout the limitations period. A-40 at ¶¶ 8-11; A-61 at ¶¶ 137, 139; A-63 at ¶¶151-54; A-67 at ¶¶ 185-187; A-68 at ¶ 191. Further, the Brand Appellees repeatedly enforced the terms of the no-hire agreements by, *e.g.*, refusing to consider or hire Appellants and other members of the proposed Class for positions to which they applied within the last four years. A-61 at ¶ 139; A-62-63 at ¶¶ 147-50, A-65-67 at ¶¶ 167-186; A-68 at ¶ 190.

## IV.    Legal Background

### A.    Antitrust Claims Under Section 1 of the Sherman Act

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce[.]" 15 U.S.C. § 1. Courts have interpreted Section 1 to prohibit only unreasonable restraints of trade. *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 98 (1984). Accordingly, to set forth a violation under Section 1, a plaintiff must plausibly allege (1) a contract, combination, or conspiracy between the defendants, that (2) unreasonably restrains trade.

A plaintiff can satisfy the first element of a Section 1 claim—a contract, combination or conspiracy designed to achieve an unlawful objective—through either direct evidence of an anticompetitive agreement or through circumstantial evidence supporting an inference of such an agreement. *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015) ("*Apple*"); *Anderson News, L.L.C.*, 680 F.3d at 184.

To satisfy the second element of a Section 1 claim, plaintiffs generally attempt to show that defendants unreasonably restrained trade under one of two

primary standards: the *per se* rule or the Rule of Reason. *See Bd. of Regents*, 468

U.S. at 98; *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 779 (1999).[3]

### 1.    Legal Standard: *Per Se* or Rule of Reason

Selection of the mode of analysis for conduct challenged under Section 1 of

the Sherman Act depends on the "nature of the restraint" alleged. *Apple*, 791 F.3d

at 297. It does not turn on the identity of the parties, *id.*, nor experience with any

particular industry. *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 351

(1982).

### a.    *Per Se* Illegality

The *per se* rule applies to conduct that courts recognize as having consistent

anticompetitive effects without sufficient offsetting procompetitive benefits. *Bd. of*

---

[3] Courts also sometimes undertake a quick look analysis, determining that a defendant's conduct is of the type that, while not *per se* illegal, is so likely to have anticompetitive effects that it is unnecessary for a court to go through the full Rule of Reason analysis. *See California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999) ("[A]n observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets"); *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (although the horizontal agreement to withhold a service from customers was not a *per se* violation, "no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement"); *see also* Areeda & Hovenkamp ¶ 1911a (4th and 5th Eds. 2013-2023) ("What [the 'quick-look'] term is intended to connote is that a certain class of restraints, while not unambiguously in the per se category, may require no more than cursory examination to establish that their principal or only effect is anticompetitive."). A plaintiff may satisfy its burden under the quick look without an "elaborate industry analysis" or proof of market power. *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978).

*Regents*, 468 U.S. at 106 ("Per se rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct."). Agreements to divide or allocate markets are illegal *per se*. The Supreme Court has explained, "One of the classic examples of a per se violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition," *i.e.*, a "market division" or "market allocation" agreement.[4] Agreements between employers not to compete for current or potential employees are market division or allocation agreements.[5]

_____

[4] *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972); *see also N.Y. ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 399, 415 (S.D.N.Y. 2000) ("Defendants' agreement to allocate patients among themselves and divide the market for hospital services is the paradigm of the horizontal market division that the Supreme Court has deemed per se illegal.").

[5] *See United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039 (N.D. Cal. 2013) ("Antitrust law does not treat employment markets differently from other markets."); Areeda & Hovenkamp ¶ 2013b (4th and 5th Eds. 2013-2023) (Agreements among employers "in which each of multiple firms promises not to hire one another's employees of a certain type, in fact operate as market-division agreements."); *id.* ("If such arrangements are 'naked' and not immunized, they are illegal per se . . . ."); *see, e.g.*, *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 471, 481-82 (W.D. Pa. 2019) (*"Railway No-Poach"*); *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1110, 1122 (N.D. Cal. 2012) ("*High-Tech*"); *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1182, 1213 (N.D. Cal. 2015); *see also* Department of Justice Antitrust Division, Federal Trade Commission , *Antitrust Guidance for Human Resource Professionals* (the "Guidance"), p.3 (Oct. 2016), https://www.justice.gov/atr/file/903511/download (last visited July 27, 2023), (providing that "[n]aked . . . no-poaching agreements among employers, whether

Even where challenged conduct falls within a category traditionally analyzed under the *per se* mode of analysis, courts may find that the Rule of Reason is more appropriate where a restraint is "ancillary" to a legitimate, procompetitive collaboration, as opposed to "naked." To be "ancillary" the challenged restraint must be "reasonably necessary to achieve any of the efficiency-enhancing benefits" of the collaboration. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 338 (2d Cir. 2008) (Sotomayor, J., concurring) ("MLB Props."). Courts approach such claims with skepticism, imposing a "heavy burden" of evidentiary proof on the defendant. *Bd. of Regents*, 468 U.S. at 113-120 (considering and rejecting claimed competitive justifications).

### b.    Rule of Reason

Courts may instead analyze a restraint on trade under the Rule of Reason, a three-step burden-shifting process. *Apple*, 791 F.3d at 329. The plaintiff first must show that the unlawful agreement produces anticompetitive effects. "The plaintiff[] can make this showing directly or indirectly. Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (citations

---

entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws.")

omitted). The plaintiff may establish anticompetitive effects indirectly by showing that the defendant has "sufficient market power to cause an adverse effect on competition." *Tops Mkts. Inc. v. Quality Mkts. Inc.*, 142 F.3d 90, 96 (2d Cir. 1998). "[A] threshold showing of market share is not a prerequisite for bringing a [Section] 1 claim[:] If a plaintiff can show actual adverse effect on competition, . . . we do not require a further showing of market power." *Todd v. Exxon Corp.*, 275 F.3d 191, 207 (2d Cir. 2001).

Once a plaintiff establishes anticompetitive effects, the burden shifts to the defendant to offer evidence that the challenged restraint has procompetitive effects. *See Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 507 (2d Cir. 2004).

If the defendant proves procompetitive benefits, then "the burden shifts back to the plaintiff[] to prove that any legitimate competitive benefits offered by defendant[] could have been achieved through less restrictive means." *Id.* (citing *Capital Imaging Assocs. P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993)).

At the pleading stage, it is typically sufficient for the plaintiff to plausibly allege anticompetitive effects, and the existence of any procompetitive benefits is rarely an appropriate consideration. *See id.* at 506-07.

**B.      Statute of Limitations for Antitrust Claims**

The statute of limitations for antitrust claims brought under the Sherman Act

is four years. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338

(1971) ("The basic rule is that damages are recoverable under the federal antitrust

acts only if suit therefor is commenced within four years after the cause of action

accrued.") (internal quotation marks omitted). An antitrust cause of action accrues,

and the limitations period begins to run, "when a defendant commits an act that

causes injury to the plaintiff." *In re Ciprofloxacin Hydrochloride Antitrust Litig.*,

261 F. Supp. 2d 188, 218 (E.D.N.Y. 2003).

A plaintiff can show a "continuing violation" that will restart the statute of

limitations with each new injury where the challenged conduct "inflict[s]

continuing and accumulating harm on [a plaintiff]." *Hanover Shoe, Inc. v. United

Shoe Mach. Corp.*, 392 U.S. 481, 502, n.15 (1968). The statute of limitations

begins anew each time a defendant takes an "overt act" that injures a plaintiff.

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188-91 (1997); *US Airways*, 938 F.3d at

68 (An overt act (1) "must be a new and independent act that is not merely a

reaffirmation of a previous act" and; (2) "must inflict new and accumulating injury

on the plaintiff.") (quotations omitted).

In *Klehr*, the Supreme Court explained that, in "a price-fixing conspiracy

that brings about a series of unlawfully high-priced sales over a period of years . . .

14

each sale to the plaintiff [is an overt act that] starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." 521 U.S. at 189 (quotation omitted).[6]

*Klehr* applies to antitrust actions involving payment of suppressed compensation to a seller for services, including underpayment of employees. *See, e.g.*, *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 106 (3d Cir. 2010) ("refus[als] to increase [plaintiff's] reimbursement rates" were "injurious acts in furtherance of the conspiracy within the limitations period"); *Turner v. McDonald's USA, LLC*, 2020 WL 3044086, at *4 (N.D. Ill. Apr. 24, 2020) ("each time plaintiff was paid a depressed wage for her labor, she was injured and the four-year statute of limitations for that injury began").

In the context of an antitrust conspiracy, the Second Circuit recognized that "there can be no unfairness in preventing a monopolist that has established its dominant position by unlawful conduct from exercising that power in later years to

---

[6] *See also Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 296 (2d Cir. 1979) ("a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period."); *US Airways*, 938 F.3d at 67–68 (quoting *Klehr,* 521 U.S. at 189); *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1065 (8th Cir. 2017) ("*Propane*"); *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014); *In re Wholesale Grocery Prod. Antitrust Litig.*, 752 F.3d 728, 736 (8th Cir. 2014) ("*Wholesale Grocery*"); *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999) ("*Morton's*").

extract an excessive price." *Berkey Photo, Inc.*, 603 F.2d at 296. The same logic pertains to conspiracies to artificially suppress prices to sellers, including wages paid to sellers of labor. *W. Penn*, 627 F.3d at 106; *Turner*, 2020 WL 3044086, at *4.

## SUMMARY OF THE ARGUMENT

Dismissal of the complaint should be reversed for two reasons. First, the District Court should have held that the statute of limitations did not bar any of the Appellants' claims, and second, it should have held that Appellants adequately alleged antitrust liability under the *per se* standard or, in the alternative, under the Rule of Reason.

***Statute of Limitations***. First, the District Court improperly dismissed the claims of three of the four Appellants under the four-year statute of limitations for federal antitrust claims. In doing so, it relied on case law that pertains to a narrow category of anticompetitive provisions in formal contracts—which this case does *not* involve—instead of anticompetitive schemes—which the case *does* involve. If the District Court had properly applied case law involving anticompetitive schemes that are not embodied in formal contracts, it would have recognized that the continuing violation doctrine governs and the claims of all the Appellants are timely.

16

***The Governing Antitrust Standard***. The second reason dismissal should be reversed is that the District Court erred in rejecting the *per se* standard, and in adopting the Rule of Reason instead, under the ancillary-restraints doctrine.

First, the District Court applied the wrong legal standard. To conclude that *per se* treatment was inappropriate under the ancillary-restraints doctrine, the Court had to determine that Appellants' complaint established that the Appellees' no-hire Scheme was *reasonably necessary* to some procompetitive collaboration among Appellees. But the Court did not make that determination. Rather, it concluded that the no-hire Scheme was merely "related to" a potentially procompetitive collaboration—here, Brand Appellants selling their products and maintaining concessions in Saks stores. A-239. That was insufficient to satisfy the ancillary-restraints doctrine. The District Court thus should have concluded that the Scheme may be subject to *per se* condemnation. That would have allowed it to determine, after the benefit of discovery, whether the no-hire Scheme was in fact reasonably necessary to Appellees' collaboration.

Second, even if the District Court had applied the correct legal standard in assessing whether the challenged restraint was ancillary to Appellees collaboration (rather than a *per se* illegal naked agreement), it erred by failing to draw all plausible inferences in Appellants' favor, and by resolving a contested fact in favor of Appellees. If it had appropriately accepted Appellants' plausible allegations, it

17

would have concluded that, as pleaded, Appellees' no-hire Scheme was *not* ancillary but was a naked restraint.

Indeed, Appellees in effect conceded that point in moving to dismiss. They contended that while they had collaborated, they had not agreed to a no-hire Scheme. In other words, their position was that the collaboration *did* function—and therefore *could* function—without the alleged Scheme. Appellants made no allegations to the contrary. The District Court erred, then, to the extent it drew an inference against Appellants in determining that the alleged Scheme was a potentially ancillary restraint. The District Court should have drawn reasonable inferences in Appellants' favor to conclude that the *per se* standard might apply and the Complaint should not be dismissed.

The District Court's errors on the statute of limitations and the proper standard of review for the challenged restraint together warrant reversal and remand. If corrected, they mean Appellants' complaint was timely and states a claim. For that reason, this Court need not reach the other major issue on which the District Court erred—whether Appellants state a claim under the Rule of Reason.

***Applying the Rule of Reason***. The District Court incorrectly concluded that Appellants failed to state a claim under the Rule of Reason. The basis for the District Court's conclusion was its improper inference—in Appellees' favor—that while Appellants adequately alleged an appropriate antitrust market, and while

18

they adequately alleged anticompetitive effects in a significant portion of that market, they did not allege anticompetitive effects on competition market-wide.

That was error for three reasons. First, Appellants made non-conclusory allegations supporting a plausible inference that the Scheme had market-wide anticompetitive effects. Those allegations explain the mechanisms by which the Scheme's effect of suppressing compensation to Saks's LREs would and did spread throughout the national market for LRE labor. Those mechanisms include that the suppression of Saks's LRE's wages eased pressure that would have otherwise forced the Brand Appellees to increase compensation to their LREs. Because of the Scheme, the Brand Appellees did not have to compete with Saks to attract and retain LREs. Further, competition among Appellees would spread information among LREs about market wage rates. The Scheme also causes widespread effects because each employer maintains internal equity in pay for its employees within and across job categories. The District Court should have accepted the plausible inference in Appellants' favor that these mechanisms combine to suppress compensation to LREs across the market.

The second error in the District Court's application of the Rule of Reason is that it is internally inconsistent. It concluded that Appellants alleged a plausible market consisting of LREs. That means the market includes reasonably interchangeable employment opportunities. It follows that if a single employer

19

were to suppress compensation to its employees within that market, but others were not to do the same, the wage suppression would be unsustainable. Too many of the single employer's workers would flee to higher paying opportunities.

The District Court determined that Appellants adequately alleged that the no-hire Scheme suppresses compensation to all of Saks's LREs. Yet it balked at the allegation that the Scheme also suppressed compensation of the Brand Appellees' LREs in the same market. Its opinion is at odds with the market definition it accepted. According to that definition, as noted above, Brand LREs are reasonably interchangeable with Saks LREs. The implication is that if Saks LRE compensation were significantly suppressed, and Brand LRE compensation were not, Saks would not be able to hire sufficient employees and would need to increase its compensation to attract workers. Further, the market definition implies that in the absence of the no-hire Scheme, Saks would increase its compensation to its LREs, forcing the Brand Appellees to do the same.

The District Court's third error in applying the Rule of Reason was to conflate the anticompetitive effects of the no-hire Scheme with its potential procompetitive effects. Courts consistently treat no-hire agreements as *per se* illegal because of their market-wide anticompetitive effects—suppressing

20

compensation.[7] That confirms the plausibility of Appellants' allegations that the Scheme had market-wide effects here. Appellees can attempt to prove after discovery that the Scheme was necessary to their collaboration (although that will be hard to do if they continue to deny the Scheme exists). But any potential procompetitive effects—for example, promoting collaboration—do not *lessen or eliminate* the market-wide anticompetitive effects—of suppressing compensation. The District Court thus should have concluded that Appellants plausibly alleged market-wide anticompetitive effects.

In sum, the District Court's determinations that Appellants adequately alleged a market for LRE labor and that the Scheme enabled Saks to suppress compensation for its LREs creates a plausible inference that the Scheme suppressed compensation to Brand LREs as well. The resulting market-wide anticompetitive effects support a claim under the Rule of Reason.

---

[7] *See e.g.*, *Railway No-Poach*, 395 F. Supp. 3d at 471, 481-82; *High-Tech*, 856 F. Supp. 2d at 1110, 1122; *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1182, 1213 (N.D. Cal. 2015); *see also* the Guidance (providing that "[n]aked . . . no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws.")

## ARGUMENT

### I. Appellants All Brought Timely Claims Under the Continuing Violation Doctrine

The District Court held that three of the four Appellants' claims were untimely because the alleged Scheme was in place at the time they were hired, more than four years before they filed suit. A-228. It so ruled even though each Appellant worked for Saks and received suppressed compensation during the statutory period.[8] *Id*. That was error.

The continuing violation doctrine creates an exception to the ordinary statute of limitations when defendants' acts in furtherance of the anticompetitive conspiracy continue to cause harm over time, whether by charging artificially inflated prices or by paying artificially suppressed compensation. *Klehr*, 521 U.S. at 189; *Zenith,* 401 U.S. at 338-39; *Propane*, 860 F.3d 1059, 1067 (8th Cir. 2017); *Wholesale Grocery*, 752 F.3d at 736; *Berkey Photo*, 603 F.2d at 295; *W. Penn*, 627 F.3d at 106; *Turner*, 2020 WL 3044086, at *4.

Here, that is what Appellants alleged occurred. Appellees' Scheme has enabled them to pay Appellants artificially suppressed compensation throughout

---

[8] The District Court found that the claims of one of the Appellants were not barred by the statute of limitations because that Appellant was rehired within the four-year limitations period. A-170-71.

22

the four-year statutory period. A-228. Appellants' claims are timely under the continuing violation doctrine.

In ruling to the contrary, the District Court relied on *US Airways*, 938 F.3d at 67, and a line of related cases involving anticompetitive terms *embodied in formal contracts*. In *US Airways*, this Court reasoned that a formal contract purports to fix parties' rights in place, such that a defendant's conduct under the contract is at times a mere reaffirmation of a past act and, thus, does not trigger a new statutory period. *Id*. at 68-69. For example, in *U.S. Airways*, the defendant charged the plaintiff inflated prices pursuant to the contract between them. *Id*. at 68. Under those circumstances, this Court held that the continuing violation did not allow for a new claim each time the antitrust defendant caused the plaintiff a new injury. *Id*. at 69.

*US Airways* does not govern here for two reasons, each sufficient to reverse the District Court's dismissal of Appellants' clams under the statute of limitations. First, *US Airways* does not apply when an anticompetitive scheme or conspiracy is not embodied in a formal contract. Second, even if Appellees had formalized their Scheme in formal contracts, this Court should not extend *US Airways* to the kind of conduct at issue in this case. This Court need not reach the second issue if it rules in favor of Appellants on the first.

A.  *US Airways* **Applies Only to Anticompetitive Terms in Formal Contracts**

Under the continuing violations doctrine, an antitrust scheme—or conspiracy or cartel—that is not memorialized in a contract triggers a new statute of limitations each time it causes injury to a plaintiff. *Klehr*, 521 U.S. at 189; *Zenith*, 401 U.S. at 338; *Hanover Shoe*, 392 U.S. at 502 n. 15. The District Court noted, in discussing the Supreme Court's opinion in *Klehr*, "that in the context of a 'price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years. . . each sale to the plaintiff [is an overt act that] starts the statutory period running again." A-224 (quoting *Klehr*, 521 U.S. at 189) (alterations in original); *see also Berkey Photo*, 603 F.2d at 296 ("a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct  prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period"); *US Airways*, 938 F.3d at 67-68 (discussing *Klehr* 521 U.S. at 189); *Propane*, 860 F.3d at 1065; *Oliver*, 751 F.3d at 1086; *Wholesale Grocery*, 752 F.3d at 736; *Morton's*, 198 F.3d at 828.

The logic of *Klehr* applies equally to antitrust actions that allege the payment of suppressed compensation to a seller for services, including underpayments to employees. *See, e.g.*, *W. Penn*, 627 F.3d at 106 ("refus[als] to increase [plaintiff's] reimbursement rates" were "injurious acts in furtherance of the conspiracy within the limitations period"); *Turner*, 2020 WL 3044086, at *4

24

("each time plaintiff was paid a depressed wage for her labor, she was injured and the four-year statute of limitations for that injury began"). As a result, Appellees triggered a new statute of limitations each time their Scheme enabled them to pay Appellants suppressed compensation.

*US Airways* establishes a narrow exception to the continuing violation doctrine for some anticompetitive conspiracies or schemes that are memorialized in formal contracts. That exception derives from the doctrinal framework for the statute of limitations. The statutory period begins to run anew for an antitrust violation each time a defendant commits an "overt act." *US Airways*, 938 F.3d at 68 (quoting *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996)). An overt act must (1) be a new and independent act, not merely a reaffirmation of a previous act; and (2) inflict new and accumulating injury on the plaintiff. *Id.*

In some circumstances, as in *US Airways*, anticompetitive acts pursuant to a formal contract are not new and independent, but rather merely reaffirm the formation of the contract. *Id.* at 69. Formal contractual terms purport to fix the legal obligations and rights of the parties. *Id.* ("A contract is a vehicle for determining at the time of contracting what should happen at some time thereafter."). Thus, compliance with a formal contract at times may merely

25

reaffirm a contractual commitment and may not constitute a new anticompetitive act that restarts the statute of limitations. *Id.*

This distinction is illustrated by *US Airways*. There, the plaintiff signed a contract with the defendant more than four years before bringing its antitrust claim. *Id.* at 67. The plaintiff's antitrust injury was based on allegations that the defendant charged the plaintiff artificially inflated prices established by the contract. *Id*. at 69. Before *US Airways*, some courts in this Circuit had held that causing antitrust injuries in accordance with a contract did not restart the statute of limitations, whereas others had held that it could, including if the resulting damages were speculative at the time. *Id*. Neither *US Airways* nor any of those cases held that the statute of limitations begins to run at the initiation of an anticompetitive scheme not embodied in any formal contracts.

The same distinction—between formal contracts and other schemes—applies to the federal appellate cases on which this Court relied in *US Airways*. 938 F.3d at 68. Each case involved anticompetitive acts pursuant to formal contracts entered more than four years before the filing of the complaint. *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999), *Varner v. Peterson Farms*, 371 F.3d 1011, 1019-20 (8th Cir. 2004), and *Eichman v. Fotomat Corp*., 880 F.2d 149, 160 (9th Cir. 1989).

Appellants did not allege that Appellees entered formal contracts memorializing their Conspiracy. Nor have Appellees presented such formal contracts to the Court. To the contrary, they have denied the Scheme even exists.

Without a formal contract, applying the exception from *US Airways* to the continuing violation doctrine would not make sense. First, there would be no purported legally binding commitment that later acts would merely reaffirm. *US Airways*, 938 F.3d at 69. Instead, each act in furtherance of an anticompetitive scheme, including each resulting overcharge or underpayment, would reflect a new, independent decision. Second, informal unlawful conspiracies and schemes require constant maintenance. The actions of the participants are not determined by contractual provisions, *id.*, but instead involve an intermingling of negotiations, policing, defections, and compliance.

It is thus unsurprising that *US Airways* emphasized that it was addressing application of the continuing violation only to anticompetitive terms in *binding contracts*, and not to any and all anticompetitive schemes or conspiracies. *Id.* at 68 ("The question we face here, then, is whether a defendant commits an 'overt act' each time a plaintiff pays a defendant a supracompetitive price *pursuant to a contract* that violates the Sherman Act.") (emphasis added); *id.* ("In the case at bar, by contrast [*to Hanover Shoe*], each allegedly supracompetitive price that [the defendant] charged [the plaintiff] was pursuant to either the 2006 or 2011

27

*contract—agreements binding the parties*.") (emphasis added); *id.* (plaintiff "has failed to identify, and we are not otherwise aware of, authority to support the proposition that each act taken *in performance of a contract* necessarily constitutes an overt act for purposes of the continuing-violation doctrine.") (emphasis added).

The alleged Scheme is an informal unlawful conspiracy and is not embodied in any purportedly binding contracts. As a result, the continuing violation doctrine governs, and the claims of all Appellants are timely.

**B.     US Airways Should Apply Only Under Limited Circumstances**

Further, even if Appellees' denials of the existence of the conspiracy prove false, and Appellants discover that the horizontal Conspiracy is memorialized in formal contracts, this Court should not extend *US Airways* to the present circumstances. Not all anticompetitive schemes and conspiracies embodied in formal contracts should be exempt from the continuing violations doctrine.

The Eighth Circuit in *Varner*, for example, acknowledged a possible continuing violation if a contract is part of an illegal tying agreement. 371 F.3d at 1020. Similarly, the Ninth Circuit in *Eichman* noted a potential continuing violation for active enforcement of an illegal contract as opposed to the mere passive receipt of profits. 880 F.2d at 160.

More generally, participants in a *per se* illegal price-fixing conspiracy should not be able to insulate themselves from civil liability simply by signing

28

illegal, formal contracts and successfully hiding them for more than the four-year

statutory period. One reason that such a ploy should not succeed is that unlawful

contracts are not enforceable; hence, maintenance of an illegal price-fixing scheme

requires ongoing conduct, even if its participants purport to enter binding contracts

as a fig leaf. *See*, *e.g.*, *Varner*, 371 F.3d at 1020 (indicating illegal tying agreement

embodied in contract may be subject to continuing violation doctrine); *see also*

*Klehr*, 521 U.S. at 189 ("Antitrust law provides that, in the case of a 'continuing

violation,' say, a price-fixing conspiracy that brings about a series of unlawfully

high priced sales over a period of years, 'each overt act that is part of the violation

and that injures the plaintiff,' e.g., each sale to the plaintiff, 'starts the statutory

period running again, regardless of the plaintiff's knowledge of the alleged

illegality at much earlier times.'") (quoting 2 P. Areeda & H Hovenkamp, Antitrust

Law ¶338b (rev. ed. 1995), and then citing *Zenith*, 401 U.S. at 338; *Hanover Shoe*,

392 U.S. at 502 n. 15; *DXS, Inc.*, 100 F.3d at 467).

Another reason for the "secret contract" ploy to fail would be if the plaintiffs

did not themselves enter the anticompetitive contracts and were unaware of their

existence. *US Airways*, 938 F.3d at 69 (holding continuing violation doctrine did

not apply to plaintiff that was aware of anticompetitive terms of contract when

agreeing to it). *See also DXS, Inc.*, 100 F.3d at 467-68 (cited at *US Airways*, 938

F.3d at 68) (reversing summary judgment based on a continuing violation even

though an allegedly unlawful policy had been announced before the statutory period because the defendant had arguably waited to implement it until the statutory period).

This Court in *US Airways* rejected "the proposition that each act taken in performance of a contract necessarily constitutes an overt act for purposes of the continuing violation doctrine." 938 F.3d at 69. That holding is limited in important ways. For example, an antitrust violation may be only *partially* memorialized in a formal contract; to the extent an antitrust defendant undertakes acts not required by a contract, *US Airways* does not insulate it from the continuing violation doctrine. Further, saying that an act taken in performance of an anticompetitive contract *does not necessarily* trigger a new statutory period, *id*., is not the same as saying it *necessarily does not* trigger a new statutory period. *US Airways* is consistent with some acts taken pursuant to a contract restarting the statute of limitations—not all acts.

These points distinguish the circumstances in *US Airways* from the allegations here. In *US Airways*, the contract at issue allegedly fixed the inflated payments that the plaintiff paid to the defendant. *Id*. at 68 ("each allegedly supracompetitive price that [the defendant] charged [the plaintiff] was pursuant to either [of two contracts at issue]—agreements binding the parties"). In contrast, if Appellees did reduce their unlawful Conspiracy to writing, there is no reason to

30

believe the agreements would specify the compensation they would pay their employees. So their underpayments would not be "pursuant to" a contract. *Id*. at 169. Only the refusal of Brand Appellees to hire Saks LRES would be.

Similarly, the anticompetitive agreements here are between the Appellees, not between Appellees and Appellants. And the contracts between the Appellee-employers and the Appellant-employees do not set compensation rigidly. Thus, no relevant anticompetitive contract would bind the parties to payments of suppressed compensation. That is another way this case varies from *US Airways*.

Finally, unlike in *US Airways*, Appellants here have alleged a *per se* antitrust violation, not simply conduct that violates federal antitrust law under the Rule of Reason. As a result, any purported effort to bind Appellants in contracts would be obviously ineffective and unenforceable. That provides yet another reason *US Airways* should not apply.

## II. The District Court Erred in Holding that the Rule of Reason Should Apply

Agreements to divide or allocate markets are subject to *per se* condemnation. The Supreme Court has explained, "One of the classic examples of a per se violation of § 1 is an agreement between competitors at the same level of

31

the market structure to allocate territories in order to minimize competition," *i.e.*, a "market division" or "market allocation" agreement. *Topco*, 405 U.S. at 608.[9]

Agreements between employers not to compete for current or potential employees are market division or allocation agreements. *eBay*, 968 F. Supp. 2d at 1039 ("Antitrust law does not treat employment markets differently from other markets."); Areeda & Hovenkamp ¶ 2013b (4th and 5th Eds. 2013-2023) (Agreement among employers "in which each of multiple firms promises not to hire one another's employees of a certain type, in fact operate as market-division agreements."); *id.* ("[I]f such arrangements are 'naked' and not immunized, they are illegal per se . . . .").[10]

However, even where *per se* treatment would otherwise be appropriate, courts may decline to apply the *per se* standard on a finding that the restraint was "ancillary" to a legitimate, procompetitive collaboration. To be "ancillary" the challenged restraint must be "reasonably necessary to achieve any of the

---

[9] *See also Saint Francis Hosp.*, 94 F. Supp. 2d at 415 ("Defendants' agreement to allocate patients among themselves and divide the market for hospital services is the paradigm of the horizontal market division that the Supreme Court has deemed per se illegal.").

[10] *See e.g.*, *Railway No-Poach*, 395 F. Supp. 3d at 471, 481-82; *High-Tech*, 856 F. Supp. 2d at 1110, 1122; *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1182, 1213 (N.D. Cal. 2015); *see also* the Guidance (providing that "[n]aked . . . no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws.")

efficiency-enhancing benefits" of the collaboration. *MLB Props.*, 542 F.3d at 338

(Sotomayor, J., concurring).

Courts approach such claims with skepticism, imposing a "heavy burden" of

evidentiary proof on the defendant. *Bd. of Regents*, 468 U.S. at 113-120

(considering and rejecting claimed competitive justifications). If the fact finder

agrees that a defendant has satisfied its heavy burden, then the burden shifts back

to the plaintiff to provide evidence that the restraint had anticompetitive effects.

Here, Appellees argued in moving to dismiss that they did not form the

alleged no-hire Scheme. A-116-123. They also asserted that, if the Scheme *did*

exist, it was ancillary to the Brand Appellees' lease and distribution agreements

with Saks whereby they sold their goods out of Saks department stores. A124-26 at

28-30.

In considering that argument, the District Court determined first that it must

decide, at this point, "'whether the nonventure restriction is a naked restraint on

trade. . . or one that is ancillary. . . and thus valid." A-237 (quoting *United States v.*

*Aiyer*, 33 F.4th 97, 115 (2d Cir. 2022)). It went on to conclude that neither *per se*

nor quick look treatment was appropriate, as "[t]he no hire agreements

[Appellants] allege are not 'naked' agreements between independent firms." A-

238.

33

The District Court's conclusion was incorrect. It both applied the wrong legal standard under the ancillary-restraints doctrine and failed to take Appellants' allegations as true and draw all reasonable inferences in their favor.

### A.      The District Court Adopted the Wrong Legal Standard

The District Court applied the wrong legal standard under the ancillary-restraints doctrine. It concluded that the doctrine applied, and thus *per se* treatment was inappropriate, simply because Appellees' Scheme was "related to" a supposed procompetitive collaboration. A-239.

But to conclude that Rule of Reason analysis was appropriate at the pleading stage, the Court had to determine that Appellants' complaint established that the Appellees' no-hire Scheme was *reasonably necessary* to a legitimate business collaboration. *See MLB Props.*, 542 F.3d at 339 (Sotomayor, J., concurring) ("[A] restraint that is unnecessary to achieve a joint venture's efficiency-enhancing benefits may not be justified based on those benefits."); *see also Borozny v. Raytheon Techs. Corp.*, 2023 WL 348323, at *8 (D. Conn. Jan. 20, 2023) (citing *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021) for the proposition that "in order to qualify as an ancillary restraint, a horizontal agreement must be (1) subordinate and collateral to a separate legitimate transaction and (2) reasonably necessary to achieving that transaction's pro-competitive purpose"); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792

F.2d 210, 224 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1033 (1987) (To be ancillary, "an agreement eliminating competition must be subordinate and collateral to a separate, legitimate transaction. . . . If [the restraint] is so broad that part of the restraint suppresses competition without creating efficiency, the restraint is, to that extent, not ancillary."); *Nat'l Bancard Corp. v. VISA USA Inc.*, 779 F.2d 592, 601 (11th Cir. 1986) (restraint is ancillary only "if it is no greater than reasonably necessary to achieve a legitimate commercial objective (i.e., has a procompetitive purpose), has no substantial anticompetitive impact, and is no broader than necessary to accomplish its procompetitive goals"). A challenged restraint must be "tailored" to a legitimate objective to qualify as ancillary. *Bd. of Regents*, 468 U.S at 119.

The District Court did not apply that standard. It concluded: "The no-hire agreements Plaintiffs allege are not 'naked agreements between independent firms" and therefore "per se treatment is inappropriate." A-238. It based that conclusion on the propositions that: (1) there is "a procompetitive collaboration between defendants" and (2) "the challenged agreement is *related to* that procompetitive collaboration." A-239 (emphasis added).

But a restraint is not ancillary merely because it is related to a potentially procompetitive collaboration. Areeda ¶ 1908b (4th and 5th Eds. 2013-2023) ("restraint does not qualify as 'ancillary' merely because it accompanies some

other agreement that is itself lawful'"); *Bd. of Regents*, 468 U.S. at 110 (restraint was "naked" even though part of larger contract and collaborative activity). An assertion that a challenged restraint was *related* to procompetitive collaboration does not satisfy the ancillary-restraints doctrine requirements that the restraint be *necessary* to achieve the business relationship, *MLB Props.,* 542 F. 3d at 339 (Sotomayor, J., concurring), and "tailored" to the procompetitive collaboration. *Bd. of Regents*, 468 U.S at 119. The District Court thus did not reach the required conclusion that the Scheme was reasonably necessary to collaboration.

Nor is the rejection of the *per se* standard justified by the District Court's observation that the Scheme "is not the same as [a relationship] between 'naked' competitors" and "[r]estraints that accompany such collaborative business relationships are generally not afforded per se treatment." A-238. The Second Circuit has instructed that a court must evaluate "the nature of the restraint, rather than the identity of each party who joins in to impose it, in determining whether the *per se* rule is properly invoked." *Apple*, 791 F.3d at 297. In *Apple*, the Second Circuit rejected defendants' argument that it should apply the Rule of Reason analysis based on the defendants' technical vertical relationship with one another; it instead inquired into the mechanisms of the alleged restraint, ultimately finding that "Apple facilitated [a] horizontal price fixing conspiracy among [other defendants] and itself participated in that conspiracy, which rendered its conduct a

36

*per se* unreasonable restraint on trade." *Id.* at 324-35; *see also Borozny*, 2023 WL 348323, at *7. The District Court here concluded only that Appellees have a procompetitive business relationship to which the Scheme was somehow "related." That does not suffice to establish that the Scheme was reasonably necessary for Appellees' collaboration.

Under the District Court's logic, any entity could shield an anticompetitive restraint from *per se* review simply by associating it with another business relationship. That is contrary to law. *See eBay*, 968 F. Supp 2d at 1039 (declining, on Rule 12(b)(6) motion, to treat restraint as ancillary "simply because [defendant] posits that it is").

As detailed below, the District Court should have allowed for discovery and required Appellees to prove that the challenged conduct was in fact reasonably necessary to their collaboration. They will likely find that difficult to do if they continue to deny the Scheme's existence. They may find it hard to argue both that they did not in fact conspire to restrain competition for LRE employees and that their Conspiracy was reasonably necessary to a procompetitive collaboration.

**B.    The District Court Improperly Drew Factual Inferences for Appellees**

The District Court also erred because, in determining that *per se* treatment was inappropriate, it drew improper inferences against Appellants. It resolved a contested factual issue—whether the Scheme was naked or ancillary to Appellees'

37

potentially procompetitive collaboration—in favor of Appellees. That was inappropriate on a motion to dismiss.

A court must construe a complaint liberally on a motion to dismiss, "accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Sacerdote v. New York Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021) (citation omitted); *Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). In determining whether a complaint states "a claim to relief that is plausible on its face," *Bacon v. Phelps*, 961 F.3d 533, 540 (2d Cir. 2020) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)), a court must assess whether "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ. of City Sch. Dist. of New York*, 631 F. 3d 57, 62 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678).

These rules apply in determining whether conduct is subject to *per se* treatment. When plaintiffs plead a market allocation agreement and raise a plausible inference that the restraint is naked, courts should accept those allegations as true. *See, e.g.*, *Borozny*, 2023 WL 348323, at *8–9; *In re Outpatient*

38

*Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968 at 978, 990 (N.D. Ill. 2022)

("*Outpatient*"); *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 635 (N.D.

Ill. 2020); *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 2018 WL

3032552, at *14-15 (S.D. Cal. June 19, 2018) ("*Aya*"); *eBay*, 968 F. Supp. 2d at

1038-40; *High-Tech.*, 856 F. Supp. 2d at 1122. Where "[p]laintiffs have a plausible

*per se* claim, the question becomes whether the evidence will establish that the

[challenged] agreements do, in fact, nakedly allocate the market. . . . Such

questions. . . must await development of the record." *Outpatient*, 630 F. Supp. 3d

at 990.

    Assessing whether an alleged restraint is naked or ancillary requires

discovery. A court must examine "the agreement's formation and character." *eBay*,

968 F. Supp. 2d at 1039-40. *eBay* recognized that "without the benefit of discovery

or factual evidence to support their contentions[,] . . . the court simply cannot

determine with certainty the nature of the restraint, and by extension, the level of

analysis to apply." *Id.*; *Aya* 2018 WL 3032552, at *15-16 ("The parties do not have

the benefit of discovery or factual evidence to support their contentions. . . . Thus,

the Court is unable to determine as a matter of law that *per se* treatment will be

inappropriate with respect to the no-poaching restraints in the context of the joint

ventures"); *High-Tech*, 856 F. Supp. 2d at 1122 ("the Court need not decide now

whether *per se* or rule of reason analysis applies. Indeed, that decision is more

appropriate on a motion for summary judgment"); *In re Delta Dental*, 484 F. Supp 3d at 635 (declining to apply ancillary restraints doctrine and noting the "difficulty of answering this question at the pleadings stage"); Areeda ¶ 305e (4th and 5th Eds. 2013-2023) ("Often, however, the decision about which rule is to be employed will await facts that are developed only in discovery.").

More recently, *Borozny* held that it was inappropriate to decide whether a market allocation regarding employees is ancillary to collaboration on a motion to dismiss. 2023 WL 348323, at *8–9. The court observed that, while "the parties spend many pages of their respective briefing arguing about whether the agreement in the instant case constitutes a naked or an ancillary restraint on trade, the Court need spend far less ink." *Id.* at 8. The complaint "allege[d] a horizontal conspiracy to restrain trade, such that it [wa]s plausible the conduct at issue could constitute a *per se* violation of the Sherman Act." *Id*. The District Court concluded that, "[a] final determination of whether the instant case in fact presents a *per se* violation, or whether it must be analyzed under the rule of reason 'is more appropriate on a motion for summary judgment.'" *Id.* at 9 (quoting *High-Tech*, 856 F. Supp. 2d at 1122).

This Court has held that "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News*, 680 F.3d at 185. It is thus unsurprising

that none of the authorities the District Court cited in rejecting the *per se* standard resolved that issue on the pleadings. *See Aiyer*, 33 F.4th at 115 (judgment entered after a jury trial); *MLB Props.*, 542 F.3d at 339 (decision on summary judgment). Yet the District Court nonetheless improperly drew a contestable inference in Appellees' favor—rather than Appellants' favor—when it found: "The no-hire agreements [Appellants] allege are not 'naked' agreements between independent firms," and are not subject to *per se* analysis. A-238-39.

> **1.  Appellants plausibly pleaded that Appellees entered a naked market allocation that is properly subject to *per se* review.**

"One of the classic examples of a *per se* violation of s[ection] 1 is" a market allocation, or "an agreement between competitors at the same level of the market structure to allocate" the market "in order to minimize competition." *Topco*, 405 U.S. at 608. Markets can be allocated by territory, customers, or services, among other things. *See id.* at 609–11. Here, Appellants pleaded allocation of the labor market for LREs.

The alleged Scheme accordingly falls within a classic category of violations that are subject to *per se* treatment. "Antitrust law does not treat employment markets differently from other markets." *eBay*, 968 F.Supp.2d at 1039. And the Second Circuit has found another traditional category of *per se* violation—price fixing—properly applied to a labor market. *See, e.g., Todd*, 275 F.3d at 201

(Sotomayor, J. concurring) ("If the plaintiff in this case could allege that defendants actually formed an agreement to fix . . . salaries, [the] *per se* rule would likely apply."). Here, "[a]n agreement among employers that they will not compete against each other for the services of a particular employee or prospective employee is, in fact, a service division agreement, analogous to a product division agreement." XII Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 2013b at 148 (3d ed. 2012).[11]

Appellants set out allegations that plausibly support an inference that the challenged no-hire agreements were naked restraints, not ancillary to a procompetitive business justification. The Complaint detailed that the Appellees formed the challenged no-hire Scheme with the purpose and effect of reducing

---

[11] *See e.g. United States v. Patel*, 2022 WL 17404509, at *8–10 (D. Conn. Dec. 2, 2022) ("The *per se* rule does not need to be rejustified for every industry that has not been subject to significant antitrust litigation, . . . and market allocation can occur when parties agree not to hire employees in a specific labor market") (internal citations and quotations omitted); *Borozony*, 2023 WL 348323, at *9 (plaintiffs allegations of a no hire and no recruitment agreement "adequately allege[] a potential claim for a *per se* violation of the Sherman Act"); *High-Tech*, 856 F. Supp. 2d at 1121–23 (plaintiffs "successfully pled a *per se* violation . . . for purposes of surviving a 12(b)(6) motion" where the plaintiffs alleged the defendant tech companies agreed to not cold call competitors' employees to solicit applications); *eBay*, 968 F. Supp. 2d at 1038–40 (the government stated a *per se* claim where defendants allegedly agreed not to solicit or hire each other's skilled high-tech employees because the alleged agreement is a "horizontal market allocation agreement"); *United States v. DaVita Inc.*, 2022 WL 266759, at *5–7 (D. Colo. Jan. 28, 2022) (denying the defendants' motion to dismiss and applying the *per se* rule to employee non-solicitation agreement because, as alleged, the agreement operated as a horizontal allocation of the labor market).

competition among them for LREs' labor and suppressing LREs' wages and job mobility. *See*, *e.g.*, A-54-55 at ¶¶ 93-94. Appellants further alleged that the no-hire Scheme was not necessary: "Companies could achieve the same results by making it attractive enough for employees not to leave." A-54 at ¶ 88 (quotation marks omitted).

>   **2.    Appellees' argument in moving to dismiss and the District Court's reasoning confirm the plausibility of Appellants' allegations.**

Appellees' arguments in their motion to dismiss, and the District Court's reasoning, confirm the plausibility of Appellants' allegations that the Scheme was not ancillary to Appellees' collaboration.

This Court has held that a "court ruling on. . . a motion [to dismiss] may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible." *Anderson News, L.L.C.*, 680 F.3d at 185; *see also Knopf v. Esposito*, 803 F. App'x 448, 453 (2d Cir. 2020) (summary order) ("On a motion to dismiss, district courts may not simply disregard allegations in the complaint and credit instead an alternative narrative advanced by defendants."); *Todd,* 275 F.3d at 203 ("fact-specific question[s] cannot be resolved on the pleadings"). That, however, is what the District Court did when it concluded that the restraint Appellants alleged was not "naked." A-180.

Appellees argued in moving to dismiss that Appellants had not made adequate allegations to plausibly establish the existence of the no-hire Scheme. A-116-124. Appellees' position was that they did *not* conspire to suppress competition. If it were true that Appellees could collaborate without the Scheme, then it is similarly plausible that the Scheme was not reasonably necessary to their collaboration.

Similarly, the District Court did not infer the existence of the Scheme based merely on Appellees collaboration. It scrutinized Appellants' complaint to ensure they had made sufficient nonconclusory allegations to plausibly establish the Conspiracy. A-172-176.

That was appropriate. An allegation of collaboration of the kind in which Appellees engaged—without more—should not suffice to plausibly establish a no-hire Scheme. Plaintiffs should have to make nonconclusory allegations about such a Scheme, as Appellants did here.

Logically, the converse should be true too. If Appellants' nonconclusory allegations about Appellees' collaboration did not alone imply the existence of the Scheme, then neither do they imply that the Scheme is reasonably necessary to Appellees' collaboration. More facts are necessary to determine whether one can exist without the other. Just as Appellants will have to prove after discovery that

the Scheme exists, so should Appellees have to prove after discovery that their collaboration could not exist without the Scheme.

**3.     To credit Appellee's contention that the no-hire Scheme was ancillary to Appellees' business relationship, the District Court improperly relied on facts outside the pleadings.**

The District Court improperly relied on facts that appeared nowhere in the Complaint in inferring that the Scheme was ancillary to Appellees' supposedly procompetitive collaboration.

Specifically, the District Court observed that "absent the no-hire agreement, there would be a continual risk that the Brand [Appellees] would use their concessions in Saks stores to recruit employees." A-180-81 (setting this out as one of two central facts to its determination that *per se* analysis was inappropriate). For this "fact," the District Court cited to the Complaint. *Id.* (citing A-48-49 at ¶¶ 56-57; A-53 at ¶ 83). But Appellants made no such allegation.

Instead, the Complaint alleged in the relevant paragraphs that, in the absence of the secret no-hire Scheme, Saks employees might have accepted employment at Prada or Brunello Cucinelli, possibly at a higher wage, or, in the alternative, might have used that opportunity to negotiate for higher compensation from Saks. *See* A-10 at ¶ 56 ("For instance, in a properly functioning and lawfully competitive labor market, if Prada believed that a certain Luxury Retail Employee performed his or her job well at Saks, Prada would be free to contact that Luxury Retail Employee

45

about an employment opportunity and, if Prada so chose, hire that Luxury Retail Employee."); A-49 at ¶ 57 ("Similarly, in a properly functioning and lawfully competitive labor market, if a Saks Luxury Retail Employee perceived Prada to be a better organization—whether because of increased wages, enhanced commission sales opportunities, better benefits, or for any other reason—he or she would be free to communicate with Prada about potential employment opportunities, apply to Prada, and ultimately obtain employment at Prada."); A-53 at ¶ 83 ("If this same Saks employee were not constrained (unbeknownst to him or her) by Saks's no-hire agreement with Brunello Cucinelli and received an offer of higher compensation from Brunello Cucinelli, the employee could accept Brunello Cucinelli's offer or attempt to negotiate a pay increase with Saks. Either way, the Luxury Retail Employee's compensation would increase.").

These allegations do not establish a "continual risk" of Brand Appellees hiring away Saks's LREs. *Id.* The cited allegations simply describe "a properly functioning and lawfully competitive labor market." A-10 at ¶¶ 56-57. The District Court thus reached its conclusion that the no-hire Scheme was ancillary to Appellees' collaboration by relying on evidence found nowhere in the Complaint.

C.     **Appellants Adequately Stated a Claim Under the Per Se Rule and the District Court Should Have Denied Appellees' Motion to Dismiss**

Appellants stated a claim under the *per se* rule with allegations that Appellees allocated the labor market for LREs. Specifically, Appellants alleged that the Appellees "face[d] competition from rival luxury retailers in the labor market for Luxury Retail Employees," A-46 at ¶ 39; that absent the alleged Conspiracy, "each [Appellee] would use lateral hiring as an important tool for recruiting and retaining skilled labor, which would increase total compensation and mobility of Luxury Retail Employees," A-52 at ¶ 80; that Appellees "each entered into, implemented, and policed the No-Hire Agreements with the purpose and effect of restraining competition in the market for Luxury Retail Employees and fixing the compensation of their Luxury Retail Employees at artificially low levels," A-55 at ¶ 94; and that the No-Hire Agreements allowed Appellees to inhibit LREs' mobility and "artificially suppress[] compensation for [Appellants] and the class" to levels lower than what they would have received in the free market, A-55-57 at ¶¶ 98-103. These allegations state a *per se* violation. *Borozony*, 2023 WL 348323, at *8–9 (setting out parallel allegations as sufficient to state a *per se* unlawful allocation of a labor market). The District Court should have allowed discovery to provide Appellants an opportunity to prove these allegations.

## III. Appellants State a Claim Under the Rule of Reason

Even if the District Court were correct that Appellants must state a claim under the Rule of Reason to avoid dismissal, Appellants did so. To meet their pleading burden, the District Court first noted that Appellants "must allege not only cognizable harm to [themselves], but an adverse effect on competition market-wide." A-249 (quoting *Todd*, 275 F. 3d at 213). It noted that a plaintiff may do so by alleging "actual detrimental effects on competition, such as" decreased wages. A-250 (quoting *Am. Express*, 138 S. Ct. at 2284); *see also Weyerhaeuser Co v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 321 (2007) (explaining lower prices—here, wages—is the inquiry for allegations of anticompetitive effects on the buyer-side of the market). It then concluded that Appellants failed to make adequate allegations of market-wide anticompetitive effects. A-251-53.

That conclusion was improper for three reasons. First, it overlooked Appellants' well-pleaded allegations of market-wide anticompetitive effects. Appellants made non-conclusory allegations plausibly establishing those effects. Second, the ruling did not recognize that the District Court's definition of the relevant antitrust market implied that any anticompetitive effects would be market-wide. To conclude otherwise was internally inconsistent. Third, the ruling conflated the anticompetitive effects of Appellants' Scheme with its potential procompetitive effects. The District Court incorrectly concluded that, because it

48

inferred the Scheme had offsetting procompetitive effects, it should set aside widespread recognition that no-hire agreements have anticompetitive effects that are market-wide, including the suppression of compensation.

### A. Appellants Make Non-Conclusionary Allegations Of Market-Wide Anticompetitive Effects

The District Court should have ruled that Appellants stated a claim under the Rule of Reason because they made non-conclusory allegations supporting the plausible inference that the no-hire agreement had market-wide anticompetitive effects. In finding Appellants' allegations conclusory, the District Court failed to address all of Appellants' relevant allegations. *See* A-252 (quoting Appellants' argument regarding wage suppression of Saks LREs (*see* A-173) and finding it "conclusory" but failing to analyze the immediately following explanation and citation to allegations and authority establishing wage suppression also of Brand LREs). The District Court accepted that the no-hire agreement suppressed compensation to Saks LREs, but it ignored Appellants' allegations explaining how the no-hire agreement also suppressed compensation to the Brand LREs. A-251.

Appellants made three sets of non-conclusory allegations that support the plausible inference that the no-hire agreement had market-wide effects. *See* A-115-117 (citing A-50-53 at ¶¶ 65-85). Appellants first alleged in detail how competition affects compensation in labor markets, *e.g.*, by creating the need for (1) "[p]reemptive retention measures" (A-50 at ¶¶ 66-70), and (2) reactive

49

compensation increases (A-50-51 at ¶¶ 71-74), both of which put upward pressure on wages for all employees in the labor market. In other words, in response to competition, employers increase their compensation across-the-board (1) to maintain morale and discourage their employees from exploring outside options and (2) to retain employees once they have developed an interest in leaving. *See*, *e.g.*, *High-Tech*, 856 F. Supp. 2d at 1121 (accepting allegations detailing how no-poach agreements would reduce employees' wages and mobility).

Second, Appellants explained how the no-hire agreement here caused anticompetitive effects "throughout the luxury retail industry" by preventing the communication of information that would occur if Saks and the Brand Appellees competed for each other's LREs. A-52-54 at ¶¶ 81-88. Competition for employees reveals to workers prevailing rates of compensation that put upward pressure on wages. *See*, *e.g.*, *High-Tech*, 856 F. Supp. 2d at 1121 (no-poach agreements can impede the spread of information between employees that would drive wages up).

Third, Appellants explained how employers, including all Appellees, monitor and manage their internal compensation structures and levels such that the effects of the absence of competition for LRE labor caused by the no-hire agreement would transmit broadly to all LREs market-wide. A-51-52 at ¶¶ 75-80. Employers maintain equity in compensation within and across categories of workers, so that increases in pay to a subset of employees has company-wide and

50

market-wide consequences. *See*, *e.g.*, *High-Tech*, 856 F. Supp. 2d at 1121
(describing how no-poach agreements cause employers to raise wages of all
employees across a labor market); *see also In re High-Tech Emp. Antitrust Litig.*,
985 F. Supp. 2d 1167, 1192 (N.D. Cal. 2013) ("*High-Tech II*") (accepting, at class
certification, evidence of internal equity structures as sufficient to show antitrust
impact extended across employees in the market).

These allegations meet Appellants' pleading burden. They explain the
mechanisms by which impairing Saks LRE mobility caused compensation
suppression across the market. If Saks raised wages to compete with the Brand
Appellees—which Saks would need to do to retain employees absent the
Conspiracy here—the Brand Appellees would have to preemptively raise wages to
retain LREs. A-50-53 at ¶¶ 65-85. *See*, *e.g.*, *Seaman v. Duke Univ.*, 2018 WL
671239, at *5 (M.D.N.C. Feb. 1, 2018); *High-Tech*, 856 F. Supp. 2d at 1121.
Absent the no-hire agreement, then, Saks and the Brand Appellees would have
competed more actively for LREs and would all have raised wages closer to
competitive levels. *See* A-173-175.

The District Court did not appropriately credit these non-conclusory
allegations that the no-hire agreements harmed all employees in the market, not
just those subject to active recruitment. *See* discussion *supra* at 7-8, 49-51; *see also*
A-50-53 at ¶¶ 65-85. If it had, it would have followed other courts in recognizing

51

the plausibility of the requisite anticompetitive effects in comparable circumstances. *See*, *e.g.*, *Borozny*, 2023 WL 348323, at \*2, 4 (no-poach agreements remove "upward pressure on compensation" for all workers, "not only employees looking for [] new position[s] with a competitor" as "internal equity" dictates that but-for the no-poach, the cartelists increase pay to "hire top talent away from their competitors, while also making efforts to retain their own employees"); *In re Geisinger Health & Evangelical Cmty. Hosp. Healthcare Workers Antitrust Litig.*, 2021 WL 5330783, at \*3 (M.D. Pa. Nov. 16, 2021) (rejecting claim that a no-poach plaintiff "cannot show injury [if] they do not allege that they sought work at" a co-conspirator); *see also High-Tech II*, 985 F. Supp. 2d at 1192, 1201-05; *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 293 (N.D. Cal. 2016); *Seaman*, 2018 WL 671239, at \*5; *High-Tech*, 856 F. Supp. 2d at 1121.

**B.     The District Court's Conclusion that Appellants Did Not Sufficiently Plead Market-Wide Anticompetitive Effects Is Internally Inconsistent**

The District Court reached internally inconsistent conclusions in ruling that Appellants do not satisfy the Rule of Reason. That inconsistency involves the District Court's definition of the relevant market. The District Court concluded that Appellants alleged a plausible relevant market consisting of LREs. A-245-47. It also concluded that Appellants plausibly alleged compensation suppression to Saks

LREs. A-251. These two conclusions imply that the no-hire agreement had market-wide anticompetitive effects.

By definition, significant suppression of compensation by one employer in a market is not sustainable unless accompanied by significant suppression of compensation by the other employers in the same market. In defining relevant markets in buy-side cases, economists—and the Department of Justice—apply a "SSNDP test."[12] That test defines a market as consisting of the smallest group of buyers who, if unified in a hypothetical cartel, could profitably depress wages significantly below competitive levels—or, put differently, the smallest group of buyers who could impose a Small but Significant Nontransitory Decrease in Price.

A corollary is that a significant non-transitory decrease in wages within a portion of a properly defined market necessarily establishes a market-wide effect. If only a portion of a market experiences a sustained, significant decrease in price, and the rest of the market does not, the market is defined too broadly. Control of the affected portion of the market suffices to cause anticompetitive harm.

---

[12] The SSNDP test inquires whether a hypothetical monopsonist could impose profitably a Small but Significant Nontransitory Decrease in Price. *See*, *e.g.*, *United States v. Bertelsmann SE & Co. KGaA*, 2022 WL 16949715, at *19 (D.D.C. Nov. 15, 2022); *In re Se. Milk Antitrust Litig.*, 2010 WL 8228839, at *1 (E.D. Tenn. Dec. 8, 2010). It is the mirror image of the commonly used "SSNIP test," *id.*, which inquires whether a hypothetical monopolist could impose profitably a Small but Significant Nontransitory Increase in Price. *See U.S. v. Am. Express Co.*, 838 F.3d 179, 198-99 (2d Cir. 2016); *see also* Horizontal Merger Guidelines at §4.1.1.

The District Court reached two conclusions that together establish a market-wide anticompetitive effect here. The first was that Appellants plausibly alleged an anticompetitive effect on Saks LREs—a decrease in their compensation. A-250-51. The second was that the relevant antitrust market is properly defined as including Saks's and Brand Appellees' LREs. *Id.* A-245-47. It necessarily follows that the no-hire agreement suppressed compensation to LREs across the market. If it did not, it would not have been sustainably effective.

That said, discovery may yet show that the no-hire agreement at issue in this case suppressed compensation only to Saks LREs. If so, the appropriate conclusion would then be that Saks's LREs form an appropriate antitrust market. But that conclusion would be premature given Appellants' well-pleaded allegations. Moreover, discovery may well confirm that the Scheme suppressed compensation to all Brand LREs, as Appellants allege.[13]

---

[13] *See*, *e.g.*, Horizontal Merger Guidelines §4 ("evidence that a reduction in the number of significant rivals [here the Brand Appellees] offering a group of products [here, employment positions to Saks LREs] causes prices [wages] for those products [positions] to rise [decrease] significantly can itself establish that those products form a relevant market."); *see also id.* §4.1.4 (noting that if the hypothetical monopolist (here, monopsonist) could impose a SSNIP [here, an SSNDP] on a subset of customers [here, Saks LREs], then the antitrust enforcement agencies may define the market as that group of customers). In either case, rather than dismissal, the appropriate conclusion was denying Appellees' motion to dismiss.

The District Court focused in part on the Scheme being unilateral rather than bilateral. A-250-54. It restrained the Brand Appellees from hiring Saks LREs, but not *vice versa*. But that "a market restriction promise is unilateral rather than bilateral does not determine whether" the restriction violates the antitrust laws. A-114 at n.22 (quoting Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶2134d (4th & 5th Eds. 2013-2023)). Indeed, many market allocation agreements, like the one here, "are 'unilateral' in the sense that only one party promises to stay out of the other party's market, but not vice versa." *Id.* In cases like this one, one party benefits directly from the restraint—here, Saks—while the other parties—the Brand Appellees—benefit indirectly, including from the lack of competition on wages from the direct beneficiary. *See* discussion *supra* at 7-8, 49-51 (citing A-50-53 at ¶¶ 65-85 and authorities).

### C. The District Court Conflated the Issues of Whether Appellees' Scheme Might Have Procompetitive Effects with Whether It Had Market-Wide Anticompetitive Effects

A large body of precedent recognizes that agreements between competitors not to compete for employees generally have market-wide anticompetitive effects. The District Court acknowledged this case law. *See, e.g.*, A-238-39 (distinguishing numerous no-poach cases applying the *per se* standard because they "involve naked horizontal agreements"). Courts recognize that no-hire conspiracies, like the

one at issue here, generally cause market-wide anticompetitive harms, including the suppression of compensation. *See*, *e.g.*, *Borozny*, 2023 WL 348323, at *12-13; *Outpatient*, 630 F. Supp. 3d at 980-81; *Railway No-Poach*, 395 F. Supp. 3d 464; *In re Animation Workers*, 123 F. Supp. 3d 1175; *eBay*, 968 F. Supp. 2d 1030; *High-Tech*, 856 F. Supp. 2d 1103. That is why they are generally *per se* illegal. *See* discussion *supra* at 11, 41-42. It is therefore intrinsically plausible that Appellants' Scheme had market-wide anticompetitive effects.

The District Court found these cases inapplicable because it inferred Appellees' Scheme had procompetitive effects by supporting Appellees' efforts at collaboration. A-235. But those issues are unrelated. Any procompetitive effects of the Scheme—from facilitating collaboration—would not make its market-wide anticompetitive effects disappear—including the suppression of worker compensation. The market-wide anticompetitive effects would remain. And it should be up to the finder of fact under the Rule of Reason to assess the Scheme's competing effects and to determine, taking all of them into account, whether Appellees are liable.

But what matters for present purposes is a narrower issue. The District Court based its conclusion that Appellants had not alleged the Scheme's market-wide anticompetitive effects on a *non sequitur*. It concluded that the Scheme did not cause any market-wide harm because it found that suppression of compensation to

56

all LRES may have been reasonably necessary for Appellees to collaborate. A-235. That does not follow logically. Whether the potential procompetitive effects of the Scheme justified its market-wide anticompetitive effects is a separate issue from whether those market-wide effects occurred at all.

## CONCLUSION

The District Court analyzed the statute of limitations under a standard that does not apply when an agreement is not embodied in any formal contracts, improperly concluded that Appellees' Scheme cannot be per se illegal, and incorrectly held that Appellants have failed to allege market-wide anticompetitive effects. As a result, its order granting Appellees' motion to dismiss should be reversed.

Dated: July 28, 2023                    Respectfully submitted,


By:  */s/ Innessa M. Hout*
Innessa M. Huot
Alex J. Hartzband
FARUQI & FARUQI, LLP
685 Third Avenue, 26th Fl.
New York, NY 10017
Tele: 212-983-9330
ihuot@faruqilaw.com
ahartzband@faruqilaw.com

Joshua P. Davis
BERGER MONTAGUE PC
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Tele: 415-215-0962
jdavis@bm.net

57

Eric L. Cramer*
Patrick F. Madden*
Michaela L. Wallin*
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tele: 215-875-3000
ecramer@bm.net
pmadden@bm.net
mwallin@bm.net

Daniel J. Walker
BERGER MONTAGUE PC
2001 Pennsylvania Ave, NW, Ste. 300
Washington, DC 20006
Tele: 202-559-9745
dwalker@bm.net

Joseph R. Saveri*
Steven N. Williams
Kevin E. Rayhill*
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, CA 94108
Tele: 415-500-6800
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
krayhill@saverilawfirm.com

John D. Radice
RADICE LAW FIRM, P.C.
475 Wall Street
Princeton, NJ 08540
Tele: 646-245-8502
jradice@radicelawfirm.com

Michael K. Yarnoff
KEHOE LAW FIRM, P.C.
Two Penn Center Plaza

58

1500 JFK Blvd., Suite 1020
Philadelphia, PA 19102
Tele: 215-792-6676
myarnoff@kehoelawfirm.com

*Counsel for Plaintiffs-Appellants and the Proposed
Class*

*\*Pro hac vice*

## Certificate of Compliance

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) which requires that the principal brief contain no more than 14,000 words, because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,239 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 Times New Roman 14-point font.

By:   /s/ Innessa M. Hout
      Innessa M. Hout
      *Counsel for Plaintiffs-Appellants and*
      *the Proposed Class*

      Dated: July 28, 2023

## Certificate of Service

I, Innessa M. Hout, hereby certify under penalty of perjury that on July 28, 2023, I served a copy of the Brief for Plaintiffs-Appellants by email on the following parties and caused a copy to be served by the United States Mail:

**Attorneys for Defendants-Appellees:**

Mark Andrew Perry
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036

Eric Shaun Hochstadt
David Jason Lender
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153

Robert E. Shapiro
BARACK, FERRAZZANO, KIRSCHBAUM & NAGELBERG LLP
200 West Madison Street, Suite 3900
Chicago, IL 60606

Corey William Roush
James Edward Tysse
AKIN GUMP STRAUSS HAUER & FELD LLP
Robert S. Strauss Tower
2001 K Street, NW
Washington, DC 20006

Mark H. Hamer
Ashley B. Eickhof
Kristen E. Llyod
BAKER & MCKENZIE LLP
815 Connecticut Avenue, NW
Washington, DC 20006

Richard Brosnick
Jeffrey A. Kimmel
AKERMAN LLP
1251 Avenue of The Americas, 37th Floor
New York, NY 10020


By:     /s/ Innessa M. Hout
         Innessa M. Hout

Dated: July 28, 2023